FILED IN CHAMBERS
U.S.D.C. Atlanta

APR 14 2017

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

**ORIGINAL**

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

SHAMICA BENNETT,
also known as NyAsia Abu Hamza

**CRIMINAL COMPLAINT**

Case Number: 1:17-MJ-282

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about July 13, 2016 in DeKalb County, in the Northern District of Georgia, defendant(s) did knowingly conceal a tangible object, that being a black cellular phone, with the intent to impede, obstruct and influence an FBI investigation, in violation of Title 18, United States Code, Section(s) 1519 and 2; and

willfully make a materially false statement in a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section(s) 1001.

I further state that I am a(n) FBI Task Force Officer and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

_____
Signature of Complainant
Jamey Roy

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

April 14, 2017                                   at   Atlanta, Georgia
Date                                                  City and State

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                Signature of Judicial Officer

AUSA Tracia King / 2016R00920

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jamey Roy, Federal Bureau of Investigation Task Force Officer, being first duly sworn, hereby depose and state as follows:

1. I am a Counterintelligence Special Agent with the Department of the Army (DA), federally deputized as a Special Deputy U.S. Marshal assigned to the Federal Bureau of Investigation (FBI), Atlanta Division. I have been so employed since December 2007 and assigned to the FBI since August 2014. As part of my duties as an FBI Task Force Agent, I investigate criminal violations of federal laws. Prior to my duties as an FBI Task Force Agent, I served as a DA Counterintelligence Special Agent for approximately eight years. Prior to my duties as a Counterintelligence Special Agent, I was a police officer in the state of Georgia. I graduated from the Criminal Investigators Training Program at Federal Law Enforcement Training Academy, the South Georgia Police Academy.

2. This affidavit is prepared in support of a Criminal Complaint charging Shamica BENNETT ("BENNETT"), also known as NyAsia Abu Hamza, with Obstruction, in violation of Title 18, United States Code, §§ 1519 and 2; and Making False Statements, in violation of Title 18, United States Code, § 1001.

3. This Affidavit contains information necessary to support probable cause for the issuance of the Criminal Complaint, and is not intended to include each and every fact and matter observed by me or known to the government.

4. On June 12, 2016, DeKalb County Sheriff's Deputies conducted a traffic stop of a car driven by BENNETT. Local officers conducted the stop in order to arrest the passenger who was a fugitive from Illinois (hereinafter referred to as "Person A").

5. During the arrest of Person A, DeKalb County Sheriff's Deputy observed a firearm protruding from Person A's pants pocket. The officers took Person A into custody without incident. BENNETT was allowed to leave scene with Person A's belongings including a silver cellular phone.

6. As a result of the discovery of the firearm, on June 14, 2016, FBI Special Agents arrested Person A at the DeKalb County jail pursuant a federal Criminal Complaint charging Person A with Possession of a Firearm by a Felon. On that same date, FBI interviewed Person A about the offense and about another matter under investigation by FBI.

7. During the interview, Person A stated that the only media devices in the house (referring to BENNETT's residence, which was where Person A resided) were Person A's cellular phone in BENNETT's possession, BENNETT's cellular phone and a laptop that was used mostly by BENNETT's sister. When Special Agents asked Person A whether they could get Person A's phone and look at it, Person A consented as long as FBI did not contact BENNETT to get the phone. Person A never mentioned that Person A had a second phone at BENNETT's residence.

8. On the same date, an FBI Special Agent contacted BENNETT and confirmed that she had the phone Person A possessed at the time of the arrest. The Special Agent asked whether

she would release it to FBI. She agreed to do so. The Special Agent asked whether BENNETT tampered with the phone, to which she stated she had not. The Special Agent advised her that the phone was evidence. He then admonished her not to delete or otherwise tamper with the phone. Due to the fact that BENNETT was travelling out of the state for work, the Special Agent advised that he would arrange to have someone meet her the next day in North Carolina, which is where she indicated she would be located.

9. On June 15, 2016, BENNETT met with an FBI Special Agent in North Carolina and gave him the phone, which was a silver Samsung cellular phone. BENNETT stated that she had not deleted anything or turned on the phone. However, when the Special Agent turned on the power, he observed that the phone had been restored to its factory settings.

10. A few weeks after Person A's arrest on the federal charge, FBI obtained recorded jail calls between Person A and BENNETT. I along with other Special Agents reviewed those recordings. One of the things we learned was that Person A had a second phone. In a call that occurred on June 12, 2016, Person A instructed BENNETT to get the small black phone that Person A used and to delete Person A's Facebook account. Person A stated that there was incriminating information on that account that could get him into trouble. This phone's description does not match the actual phone BENNETT gave to FBI on June 15, 2016.

11. Additionally, during the review of the recorded jail calls, Special Agents learned that Person A expressed concern to BENNETT about the FBI investigation. For example, on June 17, 2016, Person A asked BENNETT whether FBI said anything more to her about the factory reset on the Samsung phone. On June 18, 2016, Person A asked BENNETT whether FBI asked for other electronic devices, to which BENNETT stated that FBI asked and that she told them she didn't have anything.

12. On June 27, 2016, Person A told BENNETT that FBI was investigating Person A because of Person A's religion.

13. After learning about the second phone, on July 13, 2016, an FBI Special Agent and I went to BENNETT's residence located in Decatur, Georgia to see whether BENNETT would voluntarily provide us the phone. When we arrived, we spoke to BENNETT's mother outside the residence, which is where she and BENNETT's sister also resided. BENNETT's mother told us that BENNETT was a truck driver and was currently driving out of state.

14. We told BENNETT's mother that we were there to locate a phone. In response, her mother called her in our presence to inquire about the phone. BENNETT did not answer. While we were talking to her mother, BENNETT called and her mother placed her on the speaker so we could speak to BENNETT in her mother's presence. When we asked her about the black phone, BENNETT stated that she gave to FBI the only phone belonging to Person A. She added that she gave FBI the phone when she was in North Carolina. When asked whether there was another phone belonging to Person A, BENNETT stated that there was not another phone. She further stated that the only other phone Person A had was in Illinois. We then told BENNETT that we would call her back.

15. We called BENNETT outside the presence of her mother. We reminded her that she was previously warned about lying during an investigation. We were specifically referring to her conversation with the FBI Special Agent in North Carolina who warned her that lying during a federal investigation is a crime that is punishable by imprisonment. BENNETT continued to deny that she had Person A's black phone. We asked BENNETT for consent to search her room. She declined.

16. After that call, we returned to the house and spoke to BENNETT's mother outside the residence. BENNETT's mother told us that BENNETT was presently on the phone with her sister, who was inside the residence. As we were getting ready to leave, BENNETT's mother asked us to wait and she called BENNETT. During the call, she went inside the residence, after a few minutes she returned to the door and stated that BENNETT would let us search her room as long as her mother was present. We agreed. We conducted a thorough search of the room with BENNETT's mother present and with BENNETT on the phone. The black phone was not located during the search.

17. We then asked to speak to BENNETT's sister. We asked whether she entered the room either on her own or at BENNETT's direction. She stated that she did go into the room to get some deodorant. We asked whether she removed the phone. She initially denied doing so. After we admonished her about making false statements, she admitted that BENNETT called her while we were outside talking to BENNETT's mother and asked her to go into the room, locate the black phone and hide it. BENNETT's sister then admitted that she found the phone and eventually threw it into the crawl space underneath the home. We asked her to take us to the phone and she led us to the side of the house and pointed to where she hid the phone. She then reached into the crawlspace, retrieved a black ZTE cellular phone and gave it to us.

18. We knew from our review of the recorded jail calls, Person A described to BENNETT the pattern used to unlock the black phone. We, therefore, turned on the phone and using the pattern described by Person A, we were able to unlock the phone.

19. On the same date, July 13, 2016, BENNETT and Person A spoke after we left BENNETT's residence. During that recorded jail call, BENNETT told Person A that she thinks she is going to jail because FBI found the black phone and that she told FBI that she didn't know anything about a black phone. BENNETT stated that her mother found the hidden phone and gave it to FBI. Person A replied that the black phone didn't work and that Person A only used it to get on Facebook when Person A's regular phone was dead. BENNETT also stated in that call that it wouldn't be a big deal if FBI arrested her because she doesn't have a criminal history.

20. Based on the foregoing, I submit there is probable cause to believe that Shamica BENNETT committed the offense of obstruction when she counseled, commanded, induced and procured another person to conceal the black phone with the intent to impede, obstruct and influence an FBI investigation, in violation of Title 18, United States Code, §§ 1519 and 2; and that she made a materially false statement in a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, § 1001.